The last case for the afternoon is Herman v. Hilton, the appearance of Mr. Harreff of the appellant, the appearance of Mr. McDermott of the appellee. Let me mention, counsel, we request the parties to be present a half hour before the case is scheduled, just in case we might be ready to go. We're ready to go, and I want to thank you both for being here so that we can start 30 minutes early. We don't do that often, but occasionally we can. With that, Mr. Harreff, you may proceed, sir. Thank you. May it please the court. Counsel. Counsel. I'm here on behalf of Janice Herman, individually, and as special representative of the state of Northern Hilton, asking this court to reverse the order of the Logan County Circuit Court of June 24, 2010. I would like to start by pointing out that I may be in a relationship with the standards of proof and burden of persuasion here. As I've indicated in my brief, the standard here of review is the determination by a trial court of issues dealing with undue influence are not to be disturbed unless they are against the manifest weight of evidence. That runs headlong into what the burden of proof at the trial court was. The trial court is, I think, acknowledged, not only by the court, but by counsel and myself and the case law, that once there's been a showing of the use by a fiduciary to advantage himself or herself, then there's a strong presumption of fraud or undue influence. And that, according to Illinois law, can only be overcome by clear and convincing evidence. And that, I think, is what I ask the court to be mindful of, is that whether the circuit court's decision is within the manifest weight of the evidence, in terms of a finding of clear and convincing evidence, overcoming that strong presumption. I assert that the evidence is far, far short. In fact, the evidence is not only decidedly unclear, but very, very unpersuasive. I point that, in terms of the evidence, on a number of aspects of the evidence, not least of which is the fact that there's an apparent assertion by Linda Brooks that her father's receiving advice and counsel somehow gives impunity to whatever was done with the property thereafter. Well, let me ask you about this. I don't know that it gives impunity, but it seems to me that this was a factual question which the trial court addressed at length. I had a chance to see and hear all these people, and he was very impressed by the testimony, as he put it, of Thomas Harris, who was the lawyer, who said, this is what I was asked, this is what I said, this is why I said it. It was my advice that he do so. And correct me if I'm wrong, counsel. It seems that his advice was based upon the idea that, at some point, Mr. Hilton's wife, Dortha, might very well be requiring some extensive treatment, and if she was going to be eligible for, essentially, government-subsidized treatment, that she had to be, her various assets had to be transferred away, what was it, 36 months, he said, was his advice? 36 months, yes. And that's what this was all about, and that's what his advice was. Well, we didn't see and hear Mr. Harris, but Judge Feeney did, and he was very impressed, found him to be an honest guy, found this to be sound advice. Leaving aside, for the moment, the idea of is this a good thing to do or not, why shouldn't we accept Judge Feeney's assessment of Mr. Harris's credibility, and if we do, why doesn't that address the question? It doesn't, because it doesn't address what's the real issue here. What is the real issue? Because that's segmentized, because Mr. Harris did not, was not asked any advice, nor rendered any advice, with respect to the transfer of that property from Mr. Hilton to Linda Brooks thereafter. Well, but thereafter, it wouldn't have mattered, would it? I mean, isn't the focus on this point in time when the assets were taken? No, I think if you segmentize it, you can distort the aspect of what the transactions were about, because the fact of the matter is, is that under that kind of scenario, you could have a good intended transfer, say, to Mr. Hilton, and then the next day he decides he wants to go to the gambling boat and gamble it all away. I'm not sure that that's appropriate. Judge Coogan certainly didn't find it appropriate to take the assets, which he acknowledged were supposed to be used for the benefit of Mrs. Hilton, and instead of using those for her benefit, he didn't use one penny of those assets for Mrs. Hilton, even though she had... Well, let me ask you. It seems to me, and I think it's important to keep focus on, that it's February 2000 which should be the focus of this inquiry. Well, I don't think so. Again, I think... Well, explain why not. It seems to me that's when the advice was rendered and that's when the action was taken. The reason is, is because he benefited himself on the basis of establishing a benefit for her. That was his announced purpose. That was the advice of the counsel, is to take this transaction and have this money used for her, I can quote, to have assistance, to have access to assistance with her health care needs if needed. Later on, I think it's to provide a secure avenue for the Hiltons to live out their final days. Well, not a penny was used for that. Instead, the money was used for some other purpose, and that purpose was to benefit Mr. Hilton's and Linda Brooks' agenda as a matter of retribution. I'm not sure... If in February of 2000, Mrs. Dortha Hilton had to have her assets taken away to be eligible for government assistance 36 months later, then the assets had to be taken away. Isn't that correct? I take the issue, you know, with taken away. What does that mean? My understanding of spend-down is the requirement of the state of Illinois and Medicare to spend your own money for your benefit, for your benefit, and then become eligible for public assistance. So Mr. Harris is... It's not to throw your money away to someone else. No, no, you've given it to somebody else. You don't have the assets any longer. First of all, there is no indication of a gift here. She was incapable of donative intent at the time, so she wasn't giving it away. The person who was fiduciary was taking the money. Let me be more clear. It seems to me Mr. Harris is... Was Mr. Harris's advice wrong? Well, I think his concept of the spend-down, as explained by the court, was, but I know of instances where an attorney can advise someone to take money out or put a property in one person's name because of the need to be able to deal with that property without dealing with the incompetent person. I don't know of any good advice to say, I'm going to take your money and use it solely for my benefit rather than for the benefit of the ward. Was Marvin Hilton in error in relying on Harris's advice? I don't think they really relied on it because if they were relying on his rough cut advice... I try to ask my questions in a very particular way. Okay? So, the evidence according to Judge Feeney showed that he said Harris or Marvin Hilton relied upon Thomas Harris's advice. Was that a mistake? Could he rely on it? Would that be appropriate for him to rely on? A lay person can always rely on a person's advice, whether it's, number one, followed through with, and whether it was good advice are two issues that I think have to be brought into the equation as well. Well, Judge Feeney, did Judge Feeney conclude that Mr. Harris's advice was wrong? He didn't say. He didn't say. Doesn't that matter? No. Well, I don't know. It seems to me that given the follow-up of what was done with the property is what is really at issue because it shows what happened with Mrs. Hilton's property. It also goes on to the notion that this court, this very court, upheld Judge Kugin's determination as those very same assets in the finding that Mr. Hilton dissipated in order to avoid paying a creditor. That is a jail attorney. And it strikes me as odd that there is apparently some sort of parallel universe is going on if the same transaction with the same parties with the same assets, in one instance, are dissipation of assets, and in the other is somehow clear and convincingly within good faith and fair and equitable dealing such that it is an odd kind of concept in terms of the notion of justice. And beyond that, then we have, in my estimation, Judge Feeney's diversion into this notion of dissipation can only be a determination within the context of a dissolution is off base. I don't think this court thought that when it used the term dissipation. I don't think Judge Kugin did either. To me, that's a substantial error in terms of evaluating the calculus or within the calculus of evidence in this. How is it that there is clear and convincing evidence? But beyond that is in terms of the intent of Mr. Hilton. The court found, as we saw, that he found that apparently Mr. Hilton had Mrs. Hilton's best interest in mind. I don't see that. And I don't see that from the notion of a man who physically abuses his wife. I don't think that sort of conduct. He didn't ignore her. Was that in February 2000 as well? That was when the allegations started in terms of 2000. Was it in February of 2000 when the transfer occurred? Pardon me? February 2000 is when the transfer occurred, isn't that? One of them. One of them. The residence, and then you had thereafter $125,000, and then the rest of the CDs only occurred after the allegations of the physical abuse. Also, the real estate was transferred to Linda Brooks after the allegations. I'm talking about transferring the assets from Dortha Hilton to Marvin Hilton. That's correct. That occurred in 2000, before those allegations. Okay. And at the same time, he drafted a will that provided everything, if he dies, goes for the benefit of his wife. Yes. Judge Feeney thought that was a significant factor, too. Was he wrong? Yes. Why? Because Mr. Hilton had transferred all the assets, so it would be absolutely ineffective to have any assets for her because he When did he draft his will? Prior to that. Wasn't it the same time in February of 2000 when he transferred the assets that he drafted the will that provided she was going to be so beneficiary? Yes. Why is it a mistake to view that as the judge did? If you can take, deplete someone's estate and then say, I am holding this in trust for you for your secure livelihood and your elder years, what have you, and then thereafter you take that estate and deplete it purposely, without using it. The person who had the care, who should be given this money in terms of securing the livelihood or the care for Mrs. Hilton, was the person who was appointed her permanent guardian. She was completely disabled and if they really were intending on giving assets for the purpose that they stated they were, then they should have been paying it to the guardian to care for her, but they didn't. They simply made transfers in order to keep those assets away from the person who was taking not only primary but sole care of a disabled person for more than three years. They did it in the face of those allegations of physical abuse, which I maintain was proof, and I just don't see how the intent to have a good faith transfer. I suppose, because one of my big difficulties, and I'd like you to address it, is why beyond the events of the change of assets away from North, beyond February 2000, why behavior subsequent to that is even probative with regard to what happened then as being appropriate or not. Well, for the same reason that this court upheld Judge Coopen's decision. That was an entirely different issue, Counselor. You keep referencing it, but I don't see it as having anything to do with the issues before the court. Well, it's the same assets, same people, same transactions. And it doesn't answer my question anyway. Well, again. Why do we look beyond February of 2000 for anything? Because if you're saying Mr. Hilton is following Mr. Harris's advice. At the time the assets were transferred. I don't think you can segmentize it that way. Why not? Why can't you segmentize it? Because Mr. Harris gave him the advice for a single purpose. The singularity of that purpose was to take care of his wife, according to the Illinois and Medicare spend down. And the spend down says you're supposed to use those assets for the person from whom you receive those assets, not for your own purposes. That's what Mr. Hilton did. He depleted his and her estates. Did Mr. Harris testify to anything you just said? Mr. Harris didn't even know about the subsequent transfer. Counsel, Counsel, again. Did Mr. Harris testify to anything you just said? He explained the spend down. Did he explain that the assets once transferred had to be used as you just said they had to be used? He said that he did it for the spend down purposes. He didn't really explain the spend down except for the 36 months time limit. So the question is what limitation did he place in his advice to Mr. Hilton and what evidence is there in this record before us that once the assets have been moved, they have to have been held in some sort of trust for this person? Because I think it's the stated purposes that Mr. Hilton said that he was transferring them in and also Linda Brooks saying the purposes of all these transactions was to help Mrs. Hilton. Mrs. Hilton didn't get help one whiff. I think that's the essence of this. You have a fiduciary that was in a fiduciary capacity saying that I'm doing these transactions, the end result of which is that the person who he's supposed to help had absolutely nothing, whereas the person who said he was doing something for someone else got the benefit of all of the property. So if I understand you correctly, if let's take a figure of $150,000, is transferred from a person and is held in the equivalent of some trust for that person's benefit by a third party, and that's the understanding of all concern, that the state of Illinois is then going to say, oh, well, that's okay, we're not going to consider that $150,000, it will now support you? All I can say is I think that's the whole purpose of the spend-out. Is that the law? I think it is the law. Is there any record of that or is there any indication of that? As far as the brevity of the record, I think that's been explained why I don't have the record here. But in terms of what this, I think the judge and Mr. Harris are bound by the notion of what the spend-down, from a legal standpoint, means. And I don't think we can change it by simply saying what spend-down means, that you can transfer your assets to anyone, wait 36 months, and then get benefit of that. So the spend-down includes, in effect, some sort of unofficial trust for the benefit of the person from whom the assets came? I think that's the purpose of it. Is that the law? I think so. Is there anything in this record before us that indicates that, or are we just supposed to know that somehow? I think I cited that in my brief, in terms of the case. In terms of Carlton at the Lake Inc. v. Barber, I'm sorry, excuse me, it's Reed v. Department of Human Services, the Medicaid Act expresses an intent by Congress that, quote, individuals are expected to deplete their own resources before obtaining assistance from the government, end quote. I don't think it's a question of trying to do some sort of... So that means Dorothy Hinton can't have any of her own resources before she gets... She has to spend it for herself. That was the purpose of, I think, Mr. Harrison's spend-down concept, is that transfer the money to yourself and spend it on her behalf, for her care. And none of it was done. She didn't win on public aid. What do you mean? She became a ward of Ms. Janice Herman as her personal guardian. No state monies were used. So if she had established a trust at a local bank with all of her assets, then she would have still been eligible? If she spent it down? Yes. If she didn't spend it down? No. Well, it would have to be also the 30... It has to be zero within that 36-month period before the clock starts. Well, it doesn't have to be zero. There's a graduated aspect of that. But it's 36 months. Well, I think that has been changed now and then in terms of the law, that time limit. If there are no other questions, I would respectfully ask the court to reverse the Logan County Circuit Court's decision. Thank you. Mr. McDermott? Please report, counsel. Counsel. Our position is that there was clear and convincing evidence to overcome the presumption of fraud pertaining to Mr. Hilton's transfers and that the decision of Logan County Circuit Court should be upheld. You heard my discussion with Mr. O'Hara about what he calls the spend-down. Yes, Your Honor. What evidence about that was presented at trial? There was no evidence presented about spend-down at trial. It wasn't an issue. The argument you just heard Mr. O'Hara make, was that made to Judge Feeney? About the spend-down business and how it can't be used? Not that I recollect, Your Honor. Okay. Go ahead. I want to take a few minutes just to review three factors presented in my brief and the testimony of this case that support our position in the decision of the Circuit Court. First and foremost was that Mr. Hilton sought out the advice of Mr. Harris, Lincoln, Illinois attorney. He sought advice as to what he was due to do with his assets and Mr. Harris advised Mr. Hilton to transfer his assets. The testimony of Mr. Harris was that he advised Mr. Hilton to transfer the real estate from joint ownership to sole ownership by Mr. Hilton. Mr. Hilton followed this advice. He followed the advice of his attorney to protect family assets in order to be of more assistance to Mrs. Hilton as her health deteriorated. What other assets did Mrs. Hilton have besides her joint ownership? There were financial accounts, a CD, and I think maybe a money market account or something. Those financial, the accounts held by the financial institutions were held in joint tenancy as well. They were transferred at some point? Yes, they were transferred in February of 2000, I believe, January, February of 2000. So is of that date that Dorotha Hilton have any assets in her own name left? She didn't have any assets in her own name left. They were all transferred pretty much at the same time. I think the real estate was done first and then the financial accounts second. That was all around February of 2000? Yes. How did the transfer of the corpus to Ms. Brooks benefit Dorotha Hilton? You're talking about, Judge, the property or the financial accounts? Both. Well, the transfer of the financial accounts, the purpose of that was to compensate Mrs. Brooks for providing in-home care for I think it was approximately one year that that care was provided. The sum of money I think is, I don't have that figure with me, I'm sorry, but I think it was like $125,000. When was that done? I'm sorry? When was that? That was done in 2002 or 2003. When did Ms. Hilton undergo guardianship? When was guardianship established over her? For? Dorotha Hilton? I believe it was in 2002 or 2003, Your Honor. So did the guardian employ Ms. Brooks? No. No, Your Honor. So how did Ms. Brooks get into the equation of caring for Ms. Hilton? Ms. Brooks had already provided this care to Mrs. Hilton, and she was being compensated retroactively by her father. Mr. O'Hara is correct, is he not, that Mrs. Hilton in fact never received government assistance? Not that I know of, yes, Your Honor. So the purpose of this, whatever it was in February 2000, that 36 month and everything, she never did get on any sort of government subsidy? That's correct. Why didn't Janice Herman get any benefits as a result of her care for Dorotha Hilton and her wife? I can't speak to that, Judge. There was no testimony to that. But I can say that Mr. Hilton's plan when he transferred the real estate was to have Mrs. Brooks sell that real estate for him in Lincoln, Illinois, and then use the proceeds to put an addition or to compensate Mrs. Brooks somehow for providing care for Mr. and Mrs. Hilton in Kansas for the remainder of their days. Is Mr. Hilton still alive? Mr. Hilton's not, no he's not, Your Honor. When did he die? He died in 2007, I believe. Where did he live in the last part of his life? He lived in his home in Lincoln. So Janice Herman had taken care of her mother, Dorotha Hilton, for several years? I don't think it was several years, Judge. I think it was about a year, year and a half. She took care of both her mom and her dad in their Lincoln, Illinois residence. In the context of this case, she's received no payment for those services? She received payment for those services when she received the proceeds or the bulk of the proceeds from the financial accounts. We're talking about Linda Brooks. He's asking about Janice Herman. Oh, Janice Herman. No, I don't believe that she was compensated by Mr. Hilton. Sorry. If I may, Mr. Hilton's testimony was clear in that he removed Mrs. Hilton's name from the real estate and financial accounts pursuant to the advice of Mr. Harris. Mr. Hilton took the actions that he did based on advice of counsel. And it's our position, Judge, that when a person truly acts on advice of counsel, which he did, there's no testimony refuting that. It's very difficult and unjust to interpret such actions to be fraudulent. The second factor that supports our position is that Mr. Hilton's final two wills created a testamentary trust for the benefit of Mrs. Hilton. According to Mr. Hilton's estate plan, upon his death, whatever assets he had would flow into the testamentary trust, which would be used for the care of Mrs. Hilton for the rest of her life. But wouldn't that be inconsistent with the spend down if Mr. Hilton had died a week later after that will and all the assets are now Mrs. Hilton's? No, I don't think so, Judge, because that whole spend down would keep going forward. That money that would be available in that testamentary trust would have to be spent before public aid would make a determination that she would be eligible for Medicaid to pay for her nursing care. That money would still have to be spent down. What assets were left in Marvin Hilton's estate at the time he died? At the time he died, there was some personal property. Everything else had been transferred? Everything else had been transferred. There was personal property in that Lincoln, Illinois residence. My understanding is that Dorotha pre-deceased Marvin, and if she had not pre-deceased him, what would have been there to take care of her? If she had not pre-deceased him? Yes, let's say she survived Marvin, he died. Was there any property left to take care of her? Well, the plan was for Mrs. Brooks to take care of Mrs. Hilton. Of course, by then Mrs. Hilton was living with Janice Herman. Correct. But that was the plan. Mr. O'Hara argues that the events subsequently where Mr. Hilton behaved inconsistently with Mrs. Hilton's interests should be able to inform on his thoughts and intent in February of 2000. Why isn't he right? Because we don't have any indication in February 2000 that he had that in mind. They're totally separate transactions, in my opinion. He went to see Mr. Harris, Mr. Harris advised him, transfer the assets, get them out of both your names, get them into your name, and that's what he did. Well, as you heard Mr. O'Hara use the term, he argues that that unduly segmentizes, if I've got the term right, these proceedings, we shouldn't do that. What's your response? I think we should do that. I think it was, again, a separate transaction that stopped there. When you're talking about clear and convincing evidence, you're talking about this being a fraudulent transaction. You're not talking about this transaction and transactions on to the next two or three years being fraudulent transactions. You're talking about this transaction. We've got to overcome that burden that was fraudulent. I think that the testimony of Mr. Harris did just that. Were you a trial lawyer? Were you the trial lawyer in this proceeding? Yes, I was, Judge. How long did Mr. Harris testify, do you recall? I think with direct and cross-examination, it was probably an hour, maybe, 45 minutes to an hour. Was Mr. O'Hara a trial lawyer, too? Yes. Okay. The third aspect that I want to point out that supports the decision of the court was pertaining to the transfer of the financial accounts. Mr. Hilton testified at that earlier proceeding that such transfers were completed upon the advice of Mr. Harris. Transfers to Linda Brooks subsequently came after completion of these initial transfers of joint ownership to Mr. Hilton. So to be blunt, your position is that once these transfers were made, the money was then Mr. Hilton's to do with as he wished, including making payments to Linda Brooks or transferring the property to her, or, as Mr. Harris says, running up to the Peoria Riverboat and seeing how his luck would be in the roulette wheel. Your Honor, there's no evidence. I think that once the money… Is that your position, that it was his to use as he saw fit? That he as he saw fit, yes, for the best interests of he and Mrs. Hilton. That's what he wanted to do. Now, wait a second. That's not the question I asked. Are you conceding his point that there's some sort of trust that was established that when this money was transferred to him, a limitation on how he could use it? No, I'm not. So he could have run up to the riverboat and done whatever he wanted to. He could have. And it's your position that post-February 2000, once he made the transfer upon the advice of counsel and good faith, that anything thereafter doesn't matter? No, it matters. If he runs up to the riverboat and blows his money on a slot machine, and then goes to public aid the next day and says, I want to enroll my wife in public aid, they say, uh-uh. That's not going to happen. Now that's interesting. How does that work? I thought it was her assets that had to be spent down, not his. Well, her assets, correct, have to be spent down. But they can't be spent down on something frivolous like a slot machine on a riverboat. Well, no. She transferred, maybe I'm not being clear, February 2000, upon advice of counsel, you say, all of her assets were transferred to him. Yes. That starts the clock for 36 months for government assistance. Yes. 36 months later, if he has no assets, he's eligible for government assistance? If he has spent these assets appropriately. So there's a limitation on what he can do with that money? He's got to, Your Honor, to the best of my understanding, you have to spend that money for the benefit of either the person, Mr. Hilton, or his spouse, Mrs. Hilton. If you're blowing it on gambling and then come to try to get on public aid, they're going to deny you. Well, in the three years, the 36 months, from February 2000, what did he do with the money? After the... After February 2000, the money that was transferred. The money that was transferred after and sits there for 36 months. Did it just sit there? In this case, no, it didn't sit there. Well, what did Mr. Hilton do with the money? If he, as best as he knew how, he made a decision that he was going to transfer part of the funds or transfer all the joint financial accounts to Mrs. Brooks and then sell the house and use the proceeds to make accommodations for them out in Kansas. He thought that was the best thing he could do for himself and his spouse. So the events in the 36 months after February 2000 are still significant in deciding what happened in February 2000? I'm sorry. Run that one more time, Judge. Is it your position that Mr. Hilton's handling of the money that was transferred to him in February of 2000, that his handling of it over the next three years, is probative of his intent and his interests, for lack of a better way to put it, when he first got the money? No. No, I think, again, when he first got the money, that's a complete... So he gets the money, the money is his. Is that your position? He's under control of those funds, yes. Okay. Now, is there something in the record here about a requirement by Medicare or any other governmental entity to whom a request would be made to subsidize Northa Hilton after 36 months as to how Mr. Hilton was going to have to deal with those assets? Judge, we never, as best I recall, we never addressed spend down at all at trial. It never came up. But you just suggested that perhaps there's some limitation on this spend down, that Mr. Hilton is not free to use the money any way he wished. That's correct, yeah. What are the limitations and where do they come from? They're coming from my thoughts as far as the extent of the law, the spend down law. They're not in the record. They weren't presented in trial. But my understanding is during that spend down process, you've got to use that money appropriately if at the end of the period you want to try to qualify for public aid. Well, if appropriately is the standard, why does the money transferred to Linda Brooks meet that standard? Judge, that was never addressed. But I tell you, based on my experience alone, I'm not so sure that that wouldn't be a problem. Wait a second. You mean that wasn't addressed at the hearing before Judge Feeney? The propriety of that in terms of spend down? Yeah. Not that I know of. Well, how about in terms of the priority period? Well, that's what I was going to say. I mean, I would feel comfortable presenting that argument to public aid that this expenditure made to Linda Brooks was proper. I mean, in light of she provided care for a year, nonstop, 24-7. She lived with him. She wasn't then currently providing any care. It was her sister, wasn't it? No, no. It was seven months, first of all, wasn't it, when she came up from Florida? Yeah, when she came up from Florida. I think it was around seven months. Okay. And she lived in their home, the parents' home. Yes. Yeah. And that was prior to Janice Herman being appointed the guardian and having the care of Dortha for approximately how long, three years? Yes. Okay. And at what point in time did the incident of domestic violence occur? I believe, Judge, that was in the allegations were made by the authorities in 2002. And who was taking care of Ms. Hilton then? At the time, I believe Mr. Hilton was, or she was in a nursing home at that time. And the allegations of abuse pertain to Mr. Hilton coming to the nursing home and doing some bad things.  Just one last thing. At this time in 2002, was Janice Herman already the guardian providing some additional care? Is that how it worked, or what was going on at that time? At that time in 2002, Mr. O'Hara probably could address that better. I don't think that she was yet the guardian, but I may be wrong.  Thank you, Counsel. Mr. O'Hara, any rebuttals, sir? I did want to clear up. I think Justice Polk indicated, I think there was some confusion as to who took care of Mrs. Hilton. According to Linda Brooks, she took care of Mrs. Hilton for about seven months. And after the fact, they came up, Mr. Hilton and Linda Brooks came up with a payment they testified to in the guardianship of $188,000 for her services. Judge Coogan was incredulous as to that. I think it's pretty clear from the guardianship proceeding. And I also want to, in terms of the chronology aspects of this, is that there was a temporary guardianship and then a permanent guardianship as a consequence of the allegations of abuse. And then thereafter these transfers to when Brooks took place in terms of the real estate and the CDs and the rest of the monies. So it's your theory, I would take it, that that was because he was upset that the vision of the family and fingers being pointed at him and so forth. I think the evidence showed that, quite frankly. Finally, as I say, I sensed a difficulty with counsel in terms of articulating whether or not in that crux of that question that you asked, whether it's relevant after February 2000. And the difficulty in answering that, I think, shows the lack of clarity. And that it's unconvincing about the notion of indicating somehow that the law would permit someone to take someone's money for whom they are caring for and simply use it to whatever effect they want to. I don't think there's something that runs roughshod over the notion of justice and fairness. By the way, is Mr. McDermott correct when he spoke about Mrs. Hilton being in a nursing home? I don't believe so. She had those independent caretakers come into her home to check on her. And that's where the abuse... Who was paying the cost of all that? I'm not sure, quite frankly. I'm not sure. But she wasn't receiving any government assistance at that point. I'm not sure of that. Mr. Hilton wasn't paying that, was he? You don't know? I recall in the guardianship proceedings there wasn't any evidence that he was paying those bills. So there's no evidence of that. But I do know that my client, Janice Herman, exclusively and solely paid for Mrs. Hilton's care, taking care of her when she was completely disabled for over three years. When was that? That was from 2002 to 2005, to her death. Do you know the date of death of Dorotha? Yes. I know it's in there somewhere, but I'm having trouble finding it. I'm sorry, it's in the facts, but I can... I can look it up. I just thought maybe you could remember off the top of your head. Thank you. Okay, thank you, counsel. We'll take this moment of advice. We'll be in recess until tomorrow morning.